**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JUDITH JONES for Andrea Jones,**

      **Plaintiff,**

-vs-                                                    **Case No. 6:03-cv-1575-Orl-KRS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL**
**SECURITY,**

      **Defendant.**

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by Judith Jones (Jones) on behalf of her daughter, Andrea, and by Andrea Jones (Andrea) on her own behalf seeking review of the final decision of the Commissioner of Social Security (Commissioner) denying the applications for social security disability benefits for Andrea. Jones filed an application for benefits for Andrea under the children's disability provisions of the Supplemental Security Income for the Aged, Blind and Disabled problem (SSI), 42 U.S.C. § 1381, *et seq*. R. 106-08.[1] This application was denied at all levels of review within the Social Security Administration (SSA). On appeal to this Court, the case was remanded pursuant to sentence six of 42 U.S.C. § 405(g) because the tape recording of the hearing before the administrative law judge (ALJ) was inaudible. Doc. No. 10.

---

[1] Jones submitted earlier applications on Andrea's behalf, all of which were denied. Jones did not seek review of those decisions. R. 74, 77, 244.

Upon remand, the SSA Appeals Council vacated the earlier decision and remanded the case for a new hearing. In the meantime, Andrea reached age eighteen and filed her own application for adult SSI benefits. R. 292-93. The applications for children's benefits and adult benefits were consolidated for hearing before an ALJ. At the hearing, the alleged onset date of disability was amended to January 11, 2001. R. 41.

After the hearing, the ALJ concluded that Andrea was not disabled either as a child or as an adult. R. 28. Jones and Andrea seek direct review of the ALJ's decision on remand without review by the Appeals Council. The Commissioner does not contend that Andrea failed to exhaust her administrative remedies by failing to seek Appeals Council review of the decision on her application for adult SSI benefits. The matter is before me for disposition pursuant to the consent of the parties.

*Summary of the Evidence.*

Andrea was born March 27, 1985. R. 42. She completed school through the eleventh grade attending classes with students of varying exceptionalities. R. 42, 111, 117-18, 132, 169. Her grades ranged from "A" to "F," although in the third grading period of her tenth grade year her grades were "A" and "B." R. 122, 319-24; *see also* R. 187 (Andrea told Eileen Fennell, Ph.D., that she had recently made the A-B Honor Roll). She failed all parts of the GED in October 2004. R. 505.

Andrea previously worked part-time at McDonald's and as a salesperson at a beachwear store. R. 43-44, 297, 350. She was fired from the job at McDonald's, R. 360, apparently because she did not follow a supervisor's instructions, R. 164.

She was able to perform basic household chores, although Jones sometimes had to coax her to finish the tasks. R. 47-48, 58. Andrea enjoyed talking with friends on the telephone and using the computer online. R. 47, 50. She could concentrate sufficiently to play games like Solitaire. R. 51. She also watched television and could remember the plot of the show. R. 56. She read horror and romance novels, but she did not particularly enjoy reading. R. 50-51. She had a boyfriend who moved away shortly before the hearing. R. 49. She also visited her grandfather daily. R. 49. She did not drive due to a seizure disorder. R. 66.

At the hearing before an ALJ, Andrea testified that she could do simple one-or two-step jobs such as folding napkins and silverware, or working as an attendant at a parking lot making change. R. 45-46. Jones estimated that Andrea would be unable to perform this type of work for more than ten minutes without direct supervision. R. 60-61.

The evidence reflects that Andrea had a seizure disorder from about age four, confirmed by abnormal EEG tests. *E.g.*, R. 82, 168, 177-78, 199, 220, 491. As of March 2000, Andrea's seizures were well controlled by medication, although evidence indicated that she might have had a seizure in July 2004. R. 179, 206, 221, 494, 496.

Andrea also had congenital hearing loss in her left ear. She did not use a hearing aid, could talk on the telephone without assistive devices, and compensated in school by sitting in the front of the class. R. 115, 120, 137, 181, 420.[2]

---

[2] Other medical records reflect that Andrea had bouts of depression and a knee injury, both of which resolved. Because these conditions are not the subject of the appeal, I will not review this evidence in detail.

The records also established that Andrea had borderline intellectual functioning. Eileen Fennell, Ph.D., tested Andrea in November 1999 and in May 2001. Andrea had a verbal IQ of 79, a performance IQ of 71 and a full scale IQ score of 73 on the first test, and a verbal IQ of 69, a performance IQ of 78, and a full scale IQ of 71 on the second test. R. 170, 188. Other tests revealed that Andrea's ability to perform in school was "somewhat higher than would be predicted" by her IQ scores; in 2001, she scored in the 18th percentile for reading, the 10th percentile for spelling, and the 21st percentile for arithmetic. R. 188. Dr. Fennell opined that Andrea's attention, concentration, and language skills were borderline impaired to low average, her visuospatial skills were impaired, and her memory was in the borderline impaired to average range. R. 190. Dr. Fennell noted Andrea's scores were indicative of attention-deficit-hyperactivity disorder (ADHD), although she commented that Jones over-represented Andrea's symptoms. R. 190; *see also* R. 204-07 (diagnosing ADHD). *But see* R. 216 (treating physician found Andrea not hyperactive and approved discontinuation of Ritalin).

Malcolm Graham, Ph.D., examined Andrea at the request of the SSA, in May 2001 and in January 2004. He concluded that Andrea could relate information in a rational, coherent, and sequential fashion, could concentrate sufficiently to count backwards from twenty, and had good memory. In 2001, he assessed her global assessment of function (GAF)[3] at 75 to 85 and in 2004 at 70 to 80, both of which indicate transient and expectable reactions to psychosocial stressors with no more than slight impairment in social, occupational, or school functioning. R. 184, 421; DSM-

---

[3] The Global Assessment of Functioning ("GAF") scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, unable to care for self, or serious suicidal act). *Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition* 32 (4th ed. 1994)(hereinafter the "DSM-IV").

IV at 32.  This was slightly higher than the opinion rendered by Malcolm D. Roberts, M.D., who examined Andrea in September 2000 and rated her GAF score at 61 to 65.  R. 224-26.  A GAF score of 61 to 65 indicates good generally functioning with some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning.  DSM-IV at 32.

Dr. Graham opined that Andrea had a moderate limitation in her ability to understand, remember and carry out detailed instructions, and to respond to changes in the work setting.  He opined that she could understand and recall simple, but not detailed instructions, could carry out simple tasks adequate to complete eight-hour work days, but emphasized that her work demands should be mostly routine.  R. 422-24.  Mark Williams, Ph.D., who reviewed Andrea's records at the request of the SSA in February 2004, opined that Andrea would have mild limitations in activities of daily living, maintaining social functioning and a moderate limitation in maintaining concentration, persistence and pace.  R. 436.

Other doctors who reviewed Andrea's records and rendered opinions on her functional capacity as a child concluded that she had no greater than less than marked limitations in health and physical well-being due to hearing problems, in acquiring and using information, attending and completing tasks and interacting and relating with others.  R. 196, 211-12.

None of the treating or reviewing physicians opined that Andrea would have any exertional limitations.  However, one reviewing physician concluded that Andrea should avoid concentrated exposure to hazards such as machinery and heights because of her history of seizure disorder.  R. 444.

*The ALJ's Disability Determination.*

After reviewing the testimony of Jones and Andrea and the other evidence in the record, the ALJ concluded that Andrea had never engaged in substantial gainful activity and that she had no past relevant work. R. 16, 28. The ALJ found that Andrea had borderline intellectual functioning and a seizure disorder, both of which were severe impairments. However, he determined that these impairments did not meet or medically or functionally equal any impairment in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1. R. 29-30. In reaching this conclusion, the ALJ specifically considered both the child and adult listing for mental retardation, listings 112.05 and 12.05, respectively, and the listing for organic mental disorder, listing 112.02.

The ALJ noted in his statement of the evidence that in May 2001, Andrea had a verbal IQ score of 69. R. 19. He found that this was not determinative of mental retardation, citing evidence in the record of Andrea's adaptive functioning. Specifically, he observed that Andrea had been placed on "the A/B Honor Roll" and was otherwise doing well in regular and ESE classes. R. 22. He noted that Andrea reported no significant limitations in her ability to function, and was able to read, write, perform simple math problems, cook, perform household chores, and otherwise care for herself. R. 23. He also observed that when Andrea had worked part-time, there was "no indication from the employers that [she] performed poorly . . . or that she had difficulty adapting, communicating, and relating to others." *Id.* For similar reasons, the ALJ concluded that Andrea's limitations were not functionally equal to any listed impairment. R. 24-26.

The ALJ found that Andrea had a less than marked limitation in the domain of acquiring and using information based on her low IQ score. However, this IQ score was offset by Dr.

Fennell's assessment that Andrea's achievement was somewhat higher than would be predicted by her IQ score and that Andrea had performed reasonably well in school.  R. 24.  With respect to attending and completing tasks, the ALJ found that Andrea had no significant attention or concentration problems based on reports of her doctors and teachers.  R. 25.

The ALJ concluded that Andrea had no limitations in the domain of interacting and relating with others, noting that Andrea's teachers and doctors described her as well mannered and respectful and that he interacted well with friends and peer.  R. 25.  He also found no limitation in the domain of caring for yourself, and moving about and manipulating objects.  R. 25-26.

The ALJ found less than marked limitations in the domain of health and physical well-being due to Andrea's seizure disorder.  However, he observed that this condition was controlled with medication.  R. 24-25.

Continuing through the adult disability sequential evaluation, the ALJ found that Andrea had the residual functional capacity (RFC) to perform work at all exertional levels.  R. 26.  He further concluded that Andrea could perform simple unskilled work on a sustained basis, respond appropriately to supervision, coworkers and usual work situations and deal with changes in a routine setting.  R. 27.  Because of her history of seizure disorders, the ALJ further found that Andrea should avoid concentrated exposure to hazards.  R. 27.

Because Andrea had no past relevant work, the ALJ turned to the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2 (the Grids), to determine whether there was work available in the national economy that Andrea could perform.  The ALJ specifically relied on Social Security Ruling 85-15 to reach the conclusion that Andrea's limitations did not significantly

compromise her ability to work. R. 28. Accordingly, based on the Grids, the ALJ concluded that there was available work that Andrea, as an adult, could perform. *Id.*

*Standard of Review*.

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient

reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

*Analysis.*

Jones and Andrea assert two grounds supporting reversal. First, they contend that the ALJ incorrectly determined that Andrea's condition did not meet Listings 112.05(D) (Mental Retardation in Children) or 12.05(C) (Mental Retardation in Adults).[4] Second, they assert that the ALJ should have obtained the testimony of a vocational expert (VE) in evaluating whether there was other work Andrea could perform at step-five of the adult sequential evaluation. These are the only issues I will address.[5]

The Listings.

"To be considered for disability benefits under section 12.05 [or section 112.05], a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). Listings 112.05(D) and 12.05(C) provide that the listings are met if the claimant has a valid verbal, performance, or full scale IQ of 60 through 70 and another physical or mental impairment resulting in significant limitations of function is a disabling condition. 20 C.F.R. Part 404, Subpt. P, App. 1 §§ 12.05(C), 112.05(D).

---

[4] Jones and Andrea do not argue that Andrea's condition medically or functionally equaled a listed impairment.

[5] The parties were advised that issues not specifically raised would be waived. Doc. No. 40.

> Generally, a claimant meets the criteria for presumptive disability under [these listings] when the claimant presents a valid I.Q. score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than 'minimal effect' on the claimant's ability to perform basic work activities. This court, however, has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior.

*Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (citing *Edwards ex rel. Edwards v. Heckler*, 755 F.2d 1513, 1517 (11th Cir. 1985) and *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986)). A significant limitation under the regulations is "something more than 'minimal,' but less than 'severe.'" *Edwards*, 755 F.3d at 1515 (quoting *Wright v. Schweiker*, 556 F. Supp. 468, 476 (M.D. Tenn. 1983)).

There is no dispute that Andrea has borderline intellectual functioning. Dr. Fennell found on one test that Andrea's verbal IQ was 69. The evidence is also undisputed that Andrea has another physical impairment, a seizure disorder, which is a severe impairment that results in limitations on Andrea's ability to work around hazards. The Commissioner argues, however, that these factors are not dispositive because the ALJ correctly found that Andrea did not have deficits in adaptive functioning as reflected by her school records and activities of daily living.

There are various definitions of adaptive functioning used by professional associations that deal with mental retardation. *See* 67 Fed. Reg. 20,018-01, 20,022 (Apr. 24, 2002). The DSM-IV requires "in order to be mentally retarded [that] an individual must have significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic

skills, work, leisure, health and safety." *Witt v. Barnhart*, No. 05C0003, 2006 WL 2501472, at * 9 (N.D. Ill. Aug. 22, 2006)(citing DSM-IV at 39). Although the ALJ did not specifically cite to any definition of adaptive functioning, he considered the various components listed in the DSM-IV.

The ALJ found that Andrea had no limitations in the areas of communication, self-care, home living, social/interpersonal skills, work and leisure. The ALJ also noted that Andrea reported no significant limitations in her ability to read, write, perform simple math problems, cook, perform household chores, and otherwise care for herself. He found less than marked limitations in the area of health and safety (the domain of health and physical well-being) based on Andrea's seizure disorder, but he concluded that this did not rise to a functional limitation because the seizures were controlled by medication.

With respect to Andrea's functional academic abilities, the ALJ observed that Andrea had been placed on "the A/B Honor Roll" and was otherwise doing well in regular and ESE classes. While it is true that Andrea had all "A" and "B" grades one term, her grades were not consistently high. Indeed, the record reflects that she dropped out of school before graduating and that she failed all components of the GED. This suggests limitations in functional academic skills.

With respect to the ability to work, the ALJ observed that when Andrea had worked part-time, there was no indication from the employers that she performed poorly, or had difficulty adapting, communicating, and relating to others. However, the record reflects that Andrea was fired from her job at McDonald's apparently because she did not follow the instructions of a supervisor. Thus, the ALJ's finding that Andrea did not have limitations in the ability to work is not supported by substantial evidence in the record.

Nevertheless, the record is replete with professional assessments of Andrea's mental condition. None of the treating, examining, or reviewing physicians opined that Andrea's condition constituted mental retardation. Dr. Fennell expressly observed that Andrea's achievement in school was higher than expected based on her IQ scores. Her GAF scores consistently indicated that Andrea functioned well. Thus, the record as a whole is sufficient to support the ALJ's conclusion that Andrea did not have deficits in adaptive functioning sufficient to meet listings 12.05 and 112.05. Accordingly, the ALJ did not err in concluding that Andrea's condition did not meet listings 12.05 or 112.05.

Reliance on the Grids at Step Five

The next question is whether the ALJ properly relied upon the Grids to determine that there was work available in the national economy that Andrea could perform. The ALJ found that Andrea had nonexertional impairments that limit her ability to work – specifically borderline intellectual functioning that limited her to simple unskilled work on a sustained basis, and a history of seizure disorders that required that she avoid concentrated exposure to hazards. Jones and Andrea contend that when, as here, the ALJ finds that the claimant has nonexertional impairments that limit the ability to work, the ALJ must call upon a vocational expert to determine whether there is work available in the national economy that the claimant can perform.

Before the Grids were promulgated in 1979, the preferred method of determining whether there was work available that a social security claimant could perform was through the testimony of a vocational expert. *See Cowart v. Schweiker*, 662 F.2d 731, 736 (11th Cir. 1981). After the United States Supreme Court approved use of the Grids in appropriate cases, *see Heckler v.*

*Campbell*, 465 U.S. 458 (1983), three-judge panels of judges in the Eleventh Circuit began to address whether the Grids could be relied upon at step-five of the sequential evaluation process when the claimant had nonexertional impairments that limited the claimant's work skills.

The standard developed in this circuit requires the ALJ to determine initially whether the claimant's alleged nonexertional impairments limit the ability to work; if they do not, then exclusive reliance on the grids at step five of the evaluation process is generally appropriate. *See Reeves v. Heckler*, 734 F.2d 519 (11th Cir. 1984)(citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 537 (6th Cir. 1981); *see also Broz v. Schweiker*, 677 F.2d 1351, 1363 (11th Cir. 1982)(remanding for consideration whether a claimant's nonexertional impairments significantly limited his basic work skills, and then, whether the Grids could be used), *vacated*, *Heckler v. Broz*, 461 U.S. 952 (1983), *adhered to on remand, Broz v. Schweiker*, 711 F.2d 957 (11th Cir.), *modified in other respects*, 721 F.2d 1292 (11th Cir. 1983). If the ALJ finds that the claimant's nonexertional impairments significantly limit the claimant's basic work skills, otherwise stated as precluding a wide range of work at a given exertional level, then exclusive reliance on the grids is not permitted. *See Francis v. Heckler*, 749 F.2d 1562, 1567 (11th Cir. 1985); *Gibson v. Heckler*, 762 F.2d 1516, 1520 (11th Cir. 1985). Rather, the ALJ must turn to evidence of the specific jobs that the claimant can perform in light of the claimant's functional capacity. *See Gibson*, 762 F.2d at 1521-22; *Welch v. Bowen*, 854 F.2d 436, 439-40 (11th Cir. 1988); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001) ("[T]he burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.").

The ALJ's decision that nonexertional impairments do not significantly limit basic work skills (that is, do not preclude a wide range work at a given exertional level) must be supported by substantial evidence in the record. For example, in *Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989), the ALJ found that the claimant had nonexertional impairments arising from borderline intellectual functioning and a dysthymic disorder that precluded her from performing complex tasks and working under extraordinary stress. The ALJ concluded that these nonexertional limitations only slightly diminished the claimant's capacity to perform light work and relied upon the Grids to conclude that there was work available the claimant could perform. The Eleventh Circuit reversed the decision, holding that use of the Grids was inappropriate. The Court explained as follows: "Absent testimony from a vocational expert, the ALJ's conclusion that appellant's mental limitations do not significantly compromise her basic work skills or are not severe enough to preclude her from performing a wide range of light work is not supported by substantial evidence." *Id.* at 1202.

Similarly, in *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992), the ALJ found that the claimant had a seizure disorder that resulted in a nonexertional impairment limiting his ability to work around unprotected heights or hazardous machinery. The ALJ concluded that these nonexertional limitations did not reduce the range of light work available to the claimant. The court reversed this decision, emphasizing that "'it is only when the claimant can clearly do unlimited types of light work, . . . that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy." *Id.* at 839 (quoting

*Allen*, 880 F.2d at 1202, and *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. Unit A March 1981)).

The provision for work requiring the performance of only simple tasks is already contained within the Grids' unskilled work definition. *See Vuxta v. Comm'r of Soc. Sec.*, Doc. No. 04-00557-CV-FTM-33-SPC, 2006 WL 2578705, at *3 (11th Cir. Sept. 8, 2006). However, the need to avoid work around concentrated exposure to hazards is not included within the Grids' definitions. The ALJ relied upon SSR 85-15 to conclude that this nonexertional limitation did not significantly limit Andrea's basic work skills. I have not found any Eleventh Circuit decision in which the court approved reliance on a social security ruling, without other evidence, to support such a finding. Under the law discussed above, the rule in this circuit appears to be that testimony of a vocational expert is necessary to support an ALJ's conclusion that nonexertional impairments do not significantly limit basic work skills before the Grids can be relied on at step five, even as a framework for decisionmaking. *See, e.g.*, *Marbury*, 957 F.2d at 839 (requiring vocational expert when claimant has seizure disorder that precluded work around unprotected heights or dangerous moving machinery). Accordingly, remand is required to permit the Commissioner to obtain evidence from a vocational expert to determine whether Andrea's nonexertional limitations significantly limit her ability to perform work at all exertional levels. If it does, then exclusive reliance on the Grids is improper.

*Conclusion*.

Because the ALJ's decision at step five of the sequential evaluation process was not supported by substantial evidence, as discussed above, it is **ORDERED** that the decision of the

Commissioner is **REVERSED** and the case is **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings.[6] The Clerk of Court is directed to enter a judgment consistent with this order and, thereafter, to close the file.

    **DONE** and **ORDERED** in Orlando, Florida on September 17, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

---

[6] Because Jones and Andrea do not contend that Andrea's condition medically or functionally equaled a listed impairment, and because the ALJ did not err in finding that her condition did not equal a listed impairment, there is effectively nothing left to review on the application for child's benefits. However, because the SSA consolidated the applications, and because the ALJ treated the different applications as raising only separate "issues," R. 15-16, rather than as separate applications on which benefits could be independently granted or denied, I will treat the matter as the SSA did – as one case – that requires reversal for the reasons stated in this order.